UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

KYLE ANDERSON,

    *Plaintiff,*

  v.

C.R. ENGLAND, INC.,
PREMIERE TRUCK DRIVING SCHOOL,
JOHN DOES 1-5, JOHN DOES 6-10,
AND JOHN DOES 11-15,

    *Defendants.*

Case No. 2:15-CV-0083

## COMPLAINT FOR DAMAGES

Plaintiff Kyle Anderson ("Plaintiff") as and for his Complaint against Defendant C.R. England, Inc. and Premiere Truck Driving School (collectively the "Defendants"), states as follows:

### STATEMENT OF THE CASE

### Employment Discrimination

1. This is a proceeding to enforce the rights of Plaintiff and other persons similarly situated, to equal employment opportunities, their rights as employees and their civil rights as citizens of the United States. Plaintiff seeks money damages, as well as an injunction restraining Defendants from maintaining policies, practices, customs and/or usages of:

    a. Discrimination against Plaintiff and other persons similarly situated because of a disability or a perceived disability, with respect to compensation, terms, conditions, and privileges of employment, including without limitation, the hiring, transfer, promotion and pay; and

1

b. Limiting, segregating and classifying employees of Defendants in ways which deprive Plaintiff and other persons similarly situated of equal employment opportunities and/or otherwise adversely affecting their status as employees because of a disability or a perceived disability.

2. The Defendants have consistently and/or purposefully and/or negligently deprived Plaintiff and, upon information and belief, other persons similarly situated, of the rights guaranteed to them under Federal Laws as well as State and Local Laws with the intent and design, both directly and indirectly, of fostering a hostile work environment and disability discrimination to the detriment of Plaintiff and other persons similarly situated.

## FLSA VIOLATIONS

3. Additionally, Defendants intentionally failed to compensate Plaintiff for wages earned while in the employ of Defendants. As a result of Defendants' unlawful actions, Plaintiff has been harmed.

## PARTIES

4. Plaintiff Kyle Anderson ("Plaintiff") is a citizen of the United States who resides at 3650 East Fifth Road, Bremen, Indiana 46506. Plaintiff has been diagnosed with autism. Plaintiff filed a complaint with the Equal Employment Opportunity Commission Claim on November 12, 2013 and received a Right to Sue Letter on or about December 13, 2014, a copy of which is annexed hereto as **Exhibit A.** Plaintiff has satisfied all administrative prerequisites.

5. Upon information and belief, at all times herein, Defendant C.R. England, Inc. ("Defendant C.R. England") has been and is an entity duly organized and existing under the laws of the State of Utah with more than one hundred employees, and corporate headquarters located at 4701 West 2100, South Salt Lake City, Utah 84120.

6. Upon information and belief, Defendant Premier Truck Driving School ("Defendant Premiere") is an alter ego of Defendant C.R. England and is the branch of C.R. England, utilized to teach C.R. England employees how to drive trucks.  Upon information and belief, Defendant created the Premier Trucking School so that it could avoid wage and hour laws as it does not provide lawful compensation to its "hires."  Defendants C.R. England and Premiere Truck Driving School are collectively referred to as "Defendants."

7. Defendant John Does 1-5 are those individual owners and/or managerial employees of Defendant C.R. England and Defendant Premiere responsible for the employment discrimination at issue in this matter.

8. Defendant John Does 6-10 are those individual owners and/or managerial employees of Defendant C.R. England and Defendant Premiere responsible for certain FLSA violations at issue in this matter.

9. Defendant John Does 11-15 are those individual owners and/or managerial employees of Defendant C.R. England and Defendant Premiere responsible for certain FLSA violations at issue in this matter.

10. According to the C.R. England website, "C.R. England has provided truck driving jobs to experienced and inexperienced truck drivers alike since 1920. Inexperienced truck drivers or those who want to start their truck driving career can attend one of C.R. England's partner truck driving schools. Premier Truck Driving Schools are considered among the best in the industry. Admission to Premier Truck Driving School does not require a cosigner, money down, or credit requirements. C.R. England's partner truck driving school includes Commercial Driver's License (CDL) classroom training and behind the wheel

3

training. Successful graduates of the truck driving training program are guaranteed CDL jobs through C.R. England upon meeting our hiring requirements."

11.     Defendants are employers for the purposes of The Americans with Disabilities Act of 1990, 42 U.S.C § 12111 *et seq.* (the "ADA"), the Fair Labor and Standards Act ("FLSA") and Indiana State Law.

12.     Plaintiff was an employee of Defendants for the purposes of the ADA, the FLSA, and Indiana State Law.  Plaintiff was willing and able to perform his employment duties and obligations and was qualified for the employment position(s) he held at Defendants.

13.     At all times relevant, Defendants were subject to the ADA, the FLSA and Indiana Wage law.

14.     At all relevant times, Defendants affected commerce within the meaning of U.S.C. § 203(b).

15.     The gross annual volume of sales made or business done by Defendants, for each year of the past three years, was not less than $500,000.00.

16.     Defendants had the power to hire and fire Plaintiff, control their terms and conditions of employment, and determine the rate and method of any compensation in exchange for Plaintiff's services.

## JURISDICTION

17.     This Court has jurisdiction over these matters pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1441 , 29 U.S.C. § 201, and the supplemental jurisdiction statute, 28 U.S.C. § 1367, in that the state and federal claims arise from a common nucleus of operative facts such that they are so related that they form part of the same case or controversy under Article III of the United States Constitution.

18. This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with the traditional notions of fair play and substantial justice.

## VENUE

19. The venue of this action is proper because a substantial part of the events and omissions giving rise to the claim occurred in the Northern District of Indiana." (See 28 USC 1391).

## FACTUAL BACKGROUND

### Plaintiff's Employment Discrimination Claims

### Plaintiff Is Hired and Successfully Trained By Defendants

20. After completing his second year of college, Plaintiff decided to take some time off from school and enter the work force.

21. On or about June 4, 2013, while searching for a job, Plaintiff came across an internet advertisement stating that C.R. England was hiring. Although Plaintiff did not have any truck driving experience, the advertisement read "No Experience, No Problem, We Train."

22. According to their website, in order to qualify for employment at C.R. England, candidate must have (a) a horizontal field of vision rating of no less than 80 degrees, (b) pass a C.R. England road test, (c) show an original Social Security Card that has not been copied or laminated, (d) understand that firearms are strictly forbidden on C.R. England property, and (e) meet criminal record policy requirements.

23. Plaintiff, who met said requirements, applied for employment with C.R. England.

24. On or about June 5, 2013, Defendant's recruiter Trisha Payne ("Recruiter Payne") contacted Plaintiff and enrolled him in Defendant Premiere, one of C.R. England's trucking schools.

25. On June 6, 2013, Plaintiff received an email from Recruiter Payne stating, "We are excited to see you at our Burns Harbor Premier Truck Driving School! You are scheduled to start on Monday June 10, 2013. You must arrive one day prior to the start date."

26. On June 9, 2013, Plaintiff arrived in Gary, Indiana, where a Defendant employee picked up Plaintiff and brought him to Defendant's training facility in Burns Harbor, Indiana. The vehicle that picked up Plaintiff had the name C.R. England on the side of it.

27. Plaintiff, together with other trainees, was given a series of tests, including a drug test, an agility test, and a physical, all of which he easily passed.

28. The following day, Plaintiff was given a human resources overview about C.R. England and was provided with a C.R. England employment manual. The employment manual clearly stated that Defendant C.R. England, as required by law, did not discriminate based on disability.

29. Plaintiff was further warned that if he "quit" working at C.R. England within nine months, he would have to reimburse C.R. England for the cost of his training.

30. Plaintiff was further advised that grounds for dismissal included drug use, alcohol use, accidents with damages exceeding $2,000, and theft.

31. Thereafter Plaintiff and his classmates began studying Bureau of Motor Vehicle (BMV) training materials to prepare for the written portion of the BMV Commercial Driver's License (CDL) permit examination.

32. Plaintiff easily passed the written CDL permit test and received his CDL permit.

33. Thereafter, Defendants immediately started training Plaintiff on how to drive a C.R. England tractor trailer.

34. On July 6, 2013, Plaintiff passed the CDL driving test in a C.R. England tractor trailer.

35. On July 8, 2013, Defendant C.R. England advised Plaintiff that he was "hired."

36. On July 10, 2013, C.R. England driver trainer Melvin Woodfork ("Trainer Woodfork") picked Plaintiff up to start "Phase 1 Training," which included driving Trainer Woodfork's tractor trailer cross-country on multiple trips and accompanying Mr. Woodfork as he drove.

**Plaintiff is Involved in a Slight Accident**

37. On July 17, 2013, the tractor trailer that Plaintiff was driving came into contact with a gate while turning onto a curvy rest stop ramp in California. As a result of the contact, two of the tires on the tractor trailer were ruined (the "Tire Incident"). Plaintiff was advised that the Tire Incident caused less than $2,000 worth of damage.

38. Trainer Woodfork acknowledged that the rest stop ramp was difficult to navigate and explained to Plaintiff how to correctly make the turn in the future.

39. Trainer Woodfork told Plaintiff that he had to call Defendants' "Accident Coordinator" to inform her about the Tire Incident. The Accident Coordinator reviewed the details of the Tire Incident and told Plaintiff that he was "clear to drive." Thereafter, the accident was never mentioned.

40. Trainer Woodfork remained comfortable with Plaintiff's driving ability and continued to drive with him. After the Tire Incident, Plaintiff put in over 25,000 miles of driving over the course of seven cross-country trips.

41. At some point after the Tire Incident, Trainer Woodfork told Plaintiff that he was one of the best trainees he had ever worked with.

42. During his training, Plaintiff was essentially living in the truck; he was supposed to sleep while Trainer Woodfork drove. Plaintiff had difficulty sleeping in the cab of the moving truck while Trainer Woodfork drove, because Trained Woodfork spoke on the phone, listened to music and communicated with Defendant C.R. England via the truck's dispatch system when stopped.

43. Towards the end of his month-long road trip with Trainer Woodfork, due to his lack of sleep, Plaintiff experienced fatigue on a few occasions while driving. Despite pressure from Trainer Woodfork that Plaintiff drove for eleven hours at a time, on a few occasions, Plaintiff was forced to stop driving after nine or ten hours due to his fatigue.

44. Plaintiff looked forward to driving on his own, when he would no longer have to sleep on a moving truck or be disrupted by other drivers' conversations or noise.

45. Still, Plaintiff successfully completed over 25,000 miles of cross-country tractor trailer driving with Trainer Woodfork. By mid-August, he had successfully completed Defendants' Phase 1 Training, and was advised that he could begin taking the Phase 1 upgrade classes to start Phase 2 Training.

46. On or about August 16, 2013, Plaintiff returned to Burns Harbor to begin Phase 1 upgrade training.

**Plaintiff is Instructed to Meet with a Safety Instructor**

47. When he arrived for his Phase I Upgrade Training, Plaintiff was told by Defendants' Phase 1 Training Coordinator that he was not allowed to join the Phase I Upgrade

class because Defendants had placed a "medical hold" on him and he could not continue training until he met with a safety instructor.

48. Plaintiff was instructed to meet with Defendants' safety director, Dan O'Neil ("Safety Director O'Neil"), who was confused about why they were meeting and asked Plaintiff if he knew why they were meeting. Plaintiff told Safety Director O'Neil that he did not know why either, but possibly because he had experienced fatigue. Safety Director O'Neil told Plaintiff that he was required to have a medical evaluation but that he was just going to "clear it," and that Plaintiff just needed to pass a safety evaluation driving test so that he could resume training.

**Plaintiff Passes the Safety Test and is Released to Finish Phase I Upgrade Training**

49. Plaintiff passed the safety evaluation driving test and Safety Director O'Neil told him that he should return to the Phase 1 coordinator and tell them that he was ready to complete his Phase 1 Upgrade Training.

**Defendants Learn that Plaintiff is Autistic**

50. At the conclusion of their meeting, Safety Director O'Neil asked Plaintiff if he had any conditions that Defendants should be aware of.

51. Plaintiff responded that he was autistic. In response, Safety Director O'Neil asked, "Are you sure?"

52. Plaintiff responded that yes, he was sure that he was autistic, as he had been diagnosed in second grade.

**Plaintiff Reports to Phase I Upgrade Training**

53. As instructed, Plaintiff went to the Phase I coordinator to tell her that he had passed the safety exam and that Safety Director O'Neil had advised him he was to begin Phase I

Upgrade training. Plaintiff was told to return the following day to begin training.

54. The following day, Plaintiff arrived at training and was asked to perform a road test, but when Safety Director O'Neil learned that Plaintiff was going to have to take a road test, he advised the test administrator that the safety evaluation test Plaintiff passed the day before satisfied the road test requirement.

55. Plaintiff was told to sit in the waiting room and "wait on paperwork." Soon, he was instructed to call Defendant employee Shawna Garrett.

**Plaintiff is Fired Because He is Autistic**

56. Plaintiff called Shawna Garrett, whom he had never spoken to before, and she immediately asked him if he "was truly autistic." When he replied that he was, Garrett told him that he was not qualified to haul freight and stated that he should call someone to pick him up from Defendants' facility. She also indicated that C.R. England does not hire people with autism. After getting off phone with Garrett, Plaintiff asked Safety Director O'Neil, who was standing there, if the phone call meant that he was fired. Safety Director O'Neil responded, "Yes".

57. At all times during his employment, including the time of his termination, Plaintiff was licensed, ready, willing and able to perform the duties he had been hired to perform.

**Plaintiff is Humiliated and Offended By Defendants Actions**

58. Defendants failed to provide transportation to Plaintiff to get home and immediately cancelled the motel room that they had been providing to him during his training.

59. Plaintiff was forced to call his relatives looking for a ride home. He was forced to sit there and humiliatingly wait while his co-workers wondered what had happened.

60. Plaintiff had never been previously limited in life by his diagnosis of autism, had completed two years of college and had held a series of jobs. He had never previously thought

of autism--a communication disorder-as something that would or should hold him back from achieving anything that he wanted to achieve. Prior to being fired because of autism, Plaintiff had never believed that autism would or could interfere with his career.

61.     Plaintiff was ashamed and humiliated each time he was asked why he lost his job and had to explain that he was fired because he was diagnosed with autism.

62.     Plaintiff was especially offended and confused about the reasons he was terminated because he had received many extremely positive accolades during his training, and knew that he was performing well. Plaintiff's emotional well-being and self-confidence has been and continues to be extremely affected by Defendants' blatant employment discrimination.

**Defendants Demand to be Reimbursed for Plaintiff's Training Costs**

63.     Shockingly, after not paying Plaintiff properly to work essentially 24 hours, 7 days a week, and illegally and abruptly firing Plaintiff after learning that he was autistic, Defendants have sent Plaintiff bills for the costs of his training.

**FLSA VIOLATIONS**

64.     The foregoing paragraphs are incorporated herein as if set forth in full.

65.     During Plaintiff's employment, Defendant C.R. England failed to pay Plaintiff (and all other similarly situated employees) the minimum wage for all hours worked, by (1) failing to compensate Plaintiff for time spent during the initial orientation; (2) failing to compensate Plaintiff at least the federal minimum hourly wage for travel time spent traveling during normal business hours; (3) failed to compensate Plaintiff at least the federal minimum wage for all compensable time worked during "Phase 1" of the training program; and (4) Defendant C.R. England failing to compensate Plaintiff at least the federal minimum wage for all compensable hours worked when on assignment for more than 24 hours.

66. Plaintiff was hired by Defendant C.R. England in 2013 and was subjected to the violations asserted herein within the last two years.

## **FAILURE TO PAY FOR INITIAL ORIENTATION**

67. The foregoing paragraphs are incorporated herein as if set forth in full.

68. Defendant C.R. England required its newly hired drivers to attend a multi-day orientation program.

69. During this initial orientation program, Defendant C.R. England required Plaintiff to attend classes regarding the rules and procedures of Defendant C.R. England.  The classes lasted approximately 9-10 hours per day.

70. In addition to attending the orientation classes, Defendant C.R. England required Plaintiff to meet with Defendant C.R. England's employees and agents about the rules, practices, and procedures of Defendant C.R. England and to complete paperwork outside of class.

71. Defendant C.R. England required Plaintiff to pay for the orientation by requiring a fee to be paid to "process" them into the program.

72. Defendant C.R. England informed Plaintiff that upon successful completion of the orientation program, they were guaranteed a job at Defendant C.R. England.

73. Defendant England paid for the travel costs associated with bringing Plaintiff to the location of the orientation program.

74. Defendant England paid for the lodging costs associated with housing near the orientation program, although the lodging provided was subpar.

75. Upon successful completion of the multi-day orientation program, Defendant C.R. England informed its trainee employees that they would be "hired" and would begin "Phase I" of Defendant C.R. England's training program.

76. Consistent with Defendant C.R. England's policies, upon his initial hiring by Defendant C.R. England, Plaintiff was required to attend a two week orientation program in Burns Harbor, Indiana. During this orientation program, Plaintiff attended orientation class for at least 14 days which lasted more than 10 hours per day. Plaintiff was further required to engage in other compensable work during this two week period, including meeting with Defendant C.R. England's employees and agents about the rules, practices, and procedures of Defendant C.R. England outside of class and completing job-related paperwork.

77. Defendant C.R. England failed to compensate Plaintiff for *any* of the time spent during the multi-day orientation program, including time spent traveling during normal business hours to the orientation program, time spent in the orientation classes, and time spent with Defendant C.R. England's agents and employees outside of orientation classes completing job-related paperwork and discussing the rules and procedures of Defendant C.R. England.

### FAILURE TO PAY MINIMUM WAGE FOR PHASE 1 OF TRAINING

78. The foregoing paragraphs are incorporated herein as if set forth in full.

79. During Phase 1, Defendant C.R. England required Plaintiff to train with an over-the-road truck driver of Defendant C.R. England.

80. Defendant C.R. England compensated Plaintiff a daily rate for the time spent over-the-road during Phase 1.

81. Defendant C.R. England compensated Plaintiff approximately $61.43 per day for the time they spent over-the-road during Phase 1. During Phase 1, Plaintiff reported their status to Defendant C.R. England via the Qualcomm computer in the truck.

82. Upon information and belief, the Qualcomm messages were received by Defendant C.R. England in a single centralized location in Utah.

83. During Phase 1, Plaintiff was required to remain on assignment continually for more than 24 hours. (*see* 29 C.F.R. § 785.22)

84. Per 29 C.F.R. § 785.22, the maximum amount of time an employer may dock an employee who is on assignment for more than 24 hours for sleeping and meal periods is 8 hours per day. The remaining amount of time (16 hours per day) is work time and must be paid.

85. Furthermore, Plaintiff never received five hours of uninterrupted sleep, and hence, all time logged in the sleeper berth should have been paid.

86. Moreover, during Phase 1, Plaintiff regularly worked more than 16 hours per day because he was required to (1) drive the truck; (2) remain in the truck while the truck was actually moving so that they could assist in transporting the cargo; (3) complete modules via the Qualcomm during times the truck was not moving so that they could complete their training; (4) wait for cargo while being limited to the truck and not being permitted to leave the truck; (5) fuel up the vehicle and perform routine maintenance to same; and (6) remain inside the truck when stopped overnight to log time in the sleeper berth and to protect Defendant C.R. England and its customer's property.

87. Per the applicable federal minimum wage, Defendant C.R. England was required to compensate Plaintiff at least $116 per day ($7.25 x 16 hours).

88. Defendant C.R. England paid Plaintiff a daily rate below $75 per day during Phase 1.

### FAILURE TO PAY FOR COMPENSABLE TRAVEL TIME

89. The foregoing paragraphs are incorporated herein as if set forth in full.

90. Plaintiff was required to engage in significant amounts of travel during regular business hours that kept him away from home overnight.

91. Plaintiff was required to travel to the initial orientation location where he stayed overnight and away from home.

92. Plaintiff completed this travel during regular business hours.

93. Plaintiff was required to travel from the orientation location to the Phase I location where he stayed overnight and away from home. This travel was completed during regular business hours.

94. Defendant C.R. England failed to pay Plaintiff any compensation for such travel time or in some instances, paid Plaintiff $25.00 per day.

95. The travel required of Plaintiff was well beyond 4 hours per day, and accordingly, even on the occasions where Defendant C.R. England paid Plaintiff $25.00 per day, this amount was under the federal minimum wage.

96. As a result of Defendants' unlawful conduct, Plaintiff has been harmed.

### FIRST CAUSE OF ACTION
**(Americans with Disabilities Act: *Discrimination*)**

97. The foregoing paragraphs are incorporated herein as if set forth in full.

98. The conduct described above constituted unlawful discrimination against Plaintiff in violation of his rights under the ADA.

15

99. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Americans with Disabilities Act: *Hostile Work Environment*)

100. The foregoing paragraphs are incorporated herein as if set forth in full.

101. The discriminatory conduct described above was sufficiently severe and/or pervasive as to alter the conditions of Plaintiff's employment and create an abusive working environment in violation of Plaintiff's rights under the ADA by which Plaintiff was repeatedly made to feel as if his autism made him unemployable and was led to believe that because of the fact that he had been diagnosed as autistic, he was incapable of performing a job he had been capably performing.

102. By reason of the foregoing, plaintiff has been damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Americans with Disabilities Act: *Retaliation*)

103. The foregoing paragraphs are incorporated herein as if set forth in full.

104. In retaliation for Plaintiff's objections about their unlawful actions, Defendants have tarnished Plaintiff's reputation by accusing him of lying and otherwise adversely attacked his character.

105. In retaliation for Plaintiff's objections about their unlawful actions, Defendants have interfered with Plaintiff's ability to find employment by falsely representing to possible employers that Plaintiff was terminated for causing an accident.

106. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
*(Intentional Infliction of Emotional Distress)*

107. The foregoing paragraphs are incorporated herein as if set forth in full.

108. The conduct described above was extreme and outrageous and severely affected Plaintiff's sense of self and emotional well-being. The Defendants, in conspiracy with each other, engaged in the aforesaid conduct with the intent to cause severe emotional distress and/or in disregard of a substantial risk of doing so. They knew or should have known that their conduct would cause Plaintiff severe emotional distress and it did in fact do so.

109. The Defendants are vicariously liable and responsible for the conduct of the individual John Doe Defendants in this regard pursuant to the principle of respondent superior.

110. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
**(Violations of the Fair Labor Standards Act)**

111. The foregoing paragraphs are incorporated herein as if set forth in full.

112. The FLSA requires employers, such as Defendants, to minimally compensate employees, such as Plaintiff, at the federal minimum wage rate for each hour worked.

113. As a result of Defendants' company-wide practices and policies of paying its employees below the minimum wage for all hours worked each workweek, Plaintiff has been harmed.

114. John Does 1-5 are jointly and individually liable for Defendant C.R. England's failure to compensate Plaintiff at least the federal minimum wage for all hours worked because they directly or indirectly, directed, aided, abetted, and/or assisted with creating and/or executing the policies and practices which violated the FLSA.

115. John Does 6-10 are jointly and individually liable for Defendant C.R. England's failure to compensate Plaintiff at least the federal minimum wage for all hours worked because they had control over processing payroll for Plaintiff.

116. Defendants willfully failed to compensate Plaintiff the federal minimum wage.

117. As a result of Defendants' failure to compensate Plaintiff at the federal minimum wage rate, Defendants have violated and continue to violate the FLSA.

### SIXTH CAUSE OF ACTION
### (Blacklisting Under Indiana Law)

118. The foregoing paragraphs are incorporated herein as if set forth in full.

119. Pursuant to Indiana Code § 22-5-3-2, et seq., Defendants were precluded from blacklisting Plaintiff from obtaining other employment.

120. Upon information and belief, Defendants interfered with Plaintiff's ability to obtain employment by making false accusations concerning the reasons for Plaintiff's termination.

121. Plaintiff is entitled to an award under the Blacklisting statute for his actual loss, as well as exemplary damages.

### *Demand for Jury Trial*

**Plaintiff hereby demands a trial by jury in this action.**

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court to enter judgment in its favor and against the Defendants as follows:

(a) For a declaratory judgment that Defendants' acts, policies and procedures violated Plaintiff's rights under Federal and State Law.

(b) That Defendants, their agents, successors and representatives be permanently enjoined from discriminating against Plaintiff with respect to his employment on the basis of his disability; from engaging in other employment practices which discriminate on the basis of disability; from continuing to deprive Plaintiff of his rights to the equal protection of the laws and privileges and immunities under the laws in any of the respects herein above alleged; and from conspiring with each other or with any other person to deprive Plaintiff of any of said rights;

(c) That Defendants be ordered to compensate, reimburse, and make whole the Plaintiff for all the benefits the Plaintiff would have received had it not been for Defendants' unlawful conduct including, but not limited to: back pay and benefits. Plaintiff should be accorded said benefits unlawfully withheld from the date of Plaintiff's termination, with interest on the above withheld amounts to the date of payment;

(d) For actual and consequential damages as may be proven at trial, plus interest;

(e) For compensatory damages for the pain, suffering, humiliation and discriminatory treatment that Plaintiff suffered as a result of Defendants' unlawful conduct;

(f) For punitive damages in an amount to properly penalize Defendants for their misconduct and to deter such wrongdoing in the future, in an amount to be shown at trial;

(g) For an award to Plaintiff the cost and expenses of this action and reasonable attorneys' fees;

(h) Plaintiff demands the right to have a jury decide all issues raised by his complaint that are triable to a jury as a matter of right including issues common to his claim under the ADA.

(i)     Plaintiff prays for an award to compensate him for the pain and suffering and for the humiliation caused by Defendants' unlawful treatment of him in an amount no less than $1,000,000.00.

(j)     Providing that Defendant England is to compensate, reimburse, and make Plaintiff whole for any and all pay and benefits they would have received had it not been for Defendants' illegal actions, including but not limited to past lost earnings.

(k)     Awarding Plaintiff liquidated damages pursuant to the laws he is suing under in an amount equal to the actual damages in this case;

(l)     Awarding Plaintiff all other relief as the Court deems appropriate and just.

      Respectfully submitted,

       /s/ **Michael J. Hays**
      Michael J. Hays (23606-71)
      TUESLEY HALL KONOPA LLP
      212 E. LaSalle Ave., Suite 100
      South Bend, Indiana  46617
      (574) 232-3538
      mhays@thklaw.com

      *Co-Counsel for Plaintiff*

      Megan S. Goddard, Esq.
      NESENOFF & MILTENBERG, LLP
      363 Seventh Avenue, 5th Floor
      New York, New York
      (212) 736-4500
      mgoddard@nmllplaw.com